U.S. Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. Hey, Steve. I want to welcome all of you to Richmond and the Fourth Circuit Court of Appeals this morning. We have two interesting cases. First, Sue Doe v. Linda Kidd, et al. And Mr. Doe, I look forward to hearing from you, sir. Thank you, Your Honor. May it please the Court, I'm Armand Dershner from Charleston, South Carolina. I represent the appellant, Sue Doe, in this case. I'm proud to be here with my lead counsel, Patricia Harrison, who has spent 12 years in dedicated representation of Ms. Doe. In case we know that we can't just come and say we disagree with the district court, so in the comments I'm going to make, we're not going to try to repeat our brief, and I will try to be mindful of the standard of review and the burden of proof that we have. At the same time, while going through the issues, this court knows better than me, because you've been in this case longer than I have, what a huge human toll this case has taken. Ms. Doe has been mistreated for more than a decade. Fortunately now, since late 2014, she has been getting the residential habilitation, the services that this court long ago said she was entitled to get. At the same time, the human toll has been great both on her and on counsel, and in those circumstances, the orders on appeal here are particularly disappointing. There are three issues today. There are two orders being appealed, and there are cross appeals as well, in which the defendants say there shouldn't be any fees to counsel or guardian. There are three main issues. One is the amount of the fee in the federal case. Second is whether any fee at all is compensable for the related state proceedings. And third is the amount of the fee for the guardian ad litem. I'm going to spend most of my time on the first issue, though obviously if you want to hear more about something else, I'm sure you will let me know. In dealing with the amount of fee, there are two figures that I would ask the court to keep in mind. 1953 is the number of hours that lead counsel Patricia Harrison actually spent on her timesheets in this case through the date of the petition, which is May 31st of 2013. That was over a period of 10 years? Yes. Something like that? Exactly. 1953 hours in 10 years. The other figure is 1513. As of this court's decision in the second appeal in March, I think, 2011, counsel had spent 1513 hours. In other words, more than three quarters of all her hours were spent in achieving what this court said was prevailing status in March 2011 and being entitled to a reasonable fee. In those circumstances, it's hard for me to understand how the district court can decide that counsel should be entitled to 236 hours or fewer with most of the reduction based on so-called unsuccessful claims or poor results when so many of the hours were spent just getting to a point where this court said she was a prevailing party. If it's not a violation of the mandate rule, it comes pretty darn close in my view. So let me just run through. You had two appeals up here? Correct. And you won them both, at least in part. Correct. And the most recent one, the mandate said you were entitled to a reasonable attorney's fee. Exactly. Okay. The first, if you take a look, the first cut was 25 cent across the board on Patricia Harrison's hours. We think that was an abuse of discretion, and we've got lots of reasons in the brief, but to pinpoint it, the district court paid no attention at all to the fact that Harrison herself, in the exercise of billing discretion, billing judgment, had already taken off 300 hours. So taking off 300 or 400 more hours by the district court without considering that, we think, was an abuse of discretion. Turning to the next cut was reducing the hourly rate from 425 requested to 280. We think that was an abuse of discretion because the district court took the wrong benchmark. It looked heavily at two cases that had used rates of 265 and 285, I think, but in both those cases, Judge Ross Anderson and Judge Brian Harwell had said, this is the rate for routine work by associate-level lawyers, and that was the rate, the benchmark that the district court here picked, and so we think that clearly didn't apply. The third cut was 700 hours for so-called unrelated claims. We think that was an error of law under Hensley v. Eckerhart because those were not unrelated, distinct claims. Those were procedural steps along the way, and Hensley makes it real clear what's an unrelated claim. These were not. So that's... Did that include the state litigation? No. Unrelated claims. That's different to the state. Exactly. All the state stuff went out. All the state stuff went out in one paragraph elsewhere. This was 700 hours of the federal case, including time spent in the two appeals, in the two successful appeals to this court. Okay. And let me just say, before I get to the fourth cut, all these first three cuts and the fourth cut take on added significance when you think about the fact that this is a contingent, highly contingent, highly undesirable case. This court has talked in the Pelegrin decision eloquently about the importance of recognizing contingency, and the district court paid no attention to that and should have given every consideration to contingency and undesirability, paid no attention to that. Okay. That brings us to the fourth cut, the so-called poor results or CTH issue. We think it's a red herring. It's a red herring for several reasons. One, the word CTH2 is not in the complaint at all. This complaint was filed before and because Doe was not receiving any resident, was not in a residency. And so if the complaint is the definition of what the case is about, this case was about residential habilitation, about her entitlement to services in a group of causes of action all closely related, seeking the same essential relief, and there's not a word about CTH2 in the complaint. Secondly, as I say, I come back to that, 1513 hours had already been spent just in getting to what this court said was prevailing party status. So the court knocking it down to that extraordinary amount, which in the end amounted to a reduction of close to 90% of the request. As I say, it doesn't square with what actually happened.  And I'm going to be very brief and try not to get into the weeds too much, but talk just a little bit about that so-called CTH issue. And I'll just make several quick points because we've dealt with these in our brief, and I'll direct you to the pages. In our main brief, we discuss it at pages 37 to 42, and in the reply brief at page 13 to 25 and 34 to 38. Number one, we always knew that the issue of placement was a state administrative issue and kept trying to get it heard there. Defendants have cited to a number of places where they say we tried to get it done in the federal court. If you look at those, and we have discussed those in our reply brief, you'll see that those were only situations where we were trying to get the state relief that we needed from the state and couldn't do it. Secondly, the proof is in the pudding. She was always in a CTH2. Defendants put her there from the beginning. The administrative law judge said in 2007 she had to be there. And when the defendants finally re-evaluated her after losing their, what, six-year battle to try to disqualify her entirely, they said, oh, yeah, CTH2. So the fact that they had a letter back in 2003 saying CTH1 is belied by their conduct. By the way, I apologize. We didn't cite the letter, the 2003 letter in our brief. The citation for that is Joint Appendix, page 649. Okay. Turning to the merits, the defendants say if we had only appealed that 2003 letter, all this would have been saved. Well, we know we kept trying to appeal. There's no end of times in which we asked the state agency or the state administrative law judge to give us a hearing or a determination on placement. It never happened. He kept refusing, and he never did it. So the notion that an appeal would have made a difference makes little sense. In fact, there had been at that time the administrative law judge had already kicked out an appeal saying it had no jurisdiction. Secondly, the defendants say if we had only agreed to a CTH1, as they told us, that would have solved the problem. Frankly, every piece of evidence in this case shows that a CTH1 would have been dangerous and that counsel and guardian would have been derelict or worse in agreeing to it. The point, the difference between a 1 and a 2 is supervision. The defendants make it clear that the point about a CTH1 is basically a foster home, like a boarding house. A CTH2 has 24-hour awake supervision. And in this case, it's clear that Doe always needed that. And Charleston DSN Board, where counsel and guardian and father of Ms. Doe took her back in 2003 to try to get her placed, Charleston DSN put her in a CTH1. And Ms. Elliott testified before Judge Perry about why. And that testimony, I think we also didn't cite that, and I apologize again, is at pages 281 to 284 of the joint appendix. She said Doe has seizures and she takes 15 medications a day, and she does not have the capacity to do those things, to survive the seizures and to keep on taking and to know what medications and when, and some of them are quite serious medications. She cannot be on her own. And so the notion that counsel should have said, oh, yes, put her in a CTH1, that makes no sense. Why did you have to go to the state court? Pardon me? Why did you have to go to the state court? You ended up in the Supreme Court of South Carolina. We went to the state court because the defendants at some point along the way said, well, you know, she's not eligible for anything. She's not eligible for any Medicaid services, not CTH1 or 2 or anything. They were relying on a definition of something that the Supreme Court of South Carolina said was wrong. Right. There's one that appealed in the Supreme Court of South Carolina. Correct. But the judge says you don't get paid for that under 1988. That's right. That's right. You contest that here. We do contest that. That's an issue of law, and we've asked this because we believe the district court applied the wrong legal test. The district court said you only get paid if the work you did in the related proceeding contributes to establishing your cause of action here. That's not the Delaware Valley test. And so we asked this court not to decide whether she should get paid for it, but to put the right test in and to tell the district court, here's the right test, and this is what you decided on. And then we'd be happy to fight it out on that issue, because we think they are inextricably intertwined, which I think is the. . . Is that the terminology that needs to be satisfied? I think so. I think so. So, for example, we believe the odds are good that, in fact, the pendency of the federal case may have had an influence on them deciding to examine her and kick her out of the program entirely. Was that a unanimous opinion by the Supreme Court of South Carolina? No. It was three to two, because the issue. . . You don't have to explain that on it, but. . . Okay. It's a strange issue. It's a technical issue. It's more important than your time. Explain it. I just wanted to have my hand. You got through, but. . . You won. Yeah. I'll take a second. Basically, the question is, how old do you have to be before somebody can recognize you're retarded? And the administrative law judge and the agency said, unless you show signs before you're 18 that you're retarded, you're not retarded. And the Supreme Court said, no, you don't have to show the signs before you're 18, as long as you show them before you're 22. And, in fact, and here the administrative law judge in the end said, well, I don't think she showed them by the time she was 18, but she did show them by the time she was 22. Kind of an academic exercise to me, it seems, but. . . Mr. Deffner, I want. . . Yes, Judge Winn. Judge Winn, I want to ask you one question. Please. Where did you document or move for fees beyond May 2013, including fees for this appeal? We have not done that yet. So that was not an issue before the Supreme Court on this appeal? No. Correct. And insofar as the award that you are contesting here, are you contesting the award for yourself or for paralegal or just for Ms. Harris? We're contesting the award. . . well, we are contesting the award to the paralegal. And we're contesting the award to me. . . frankly, it doesn't make a whole lot of difference. But it seems to indicate it's all related to the Harrison fee. That's what we care about most. I mean, frankly, if we won on the Harrison issue and lost on everything else, it wouldn't be a bad deal. I don't care much, frankly. For me, it's only a few dollars, so I can't complain a whole lot. So it is principally the Harrison fee. And frankly, it is mostly Harrison. Frankly, also her paralegal, where the district court exercised its sort of extraordinary activity on this. What about the guardian ad litem? You haven't gotten to that. Your red light's on, but don't worry about that. Okay, thank you. As long as we're asking questions, you answer them, and we'll satisfy the state. We'll give them left time, too. I appreciate that. But the guardian ad litem, it was appointed by Judge Perry in 2003. Right. And that . . . They could have asked for $57,000, and the judge gave you $3,500 or $3,700. Correct. I think on the $50,000, actually, if I remember correctly, that includes both the federal and the state cases. The state cases often . . . I understand, but the guardian ad litem, you claim that as costs. Is that where that comes in, under 1988? Yes, it comes in as costs. That's the costs of 1988, I think. I don't have it in front of me. I think it says attorney's fees and costs. I think it's Rule 54. Rule 54E. Yeah. Talks about it. Costs other than attorney's fees. Now, the guardian ad litem was never an attorney of record in this case? Correct. The guardian ad litem was, in fact, a lawyer. Happened to be a lawyer, which made her better able to do her job, but she was not . . . She was the guardian ad litem acting for and on behalf of the disabled child. Right. And I think what the district court actually did, it seems, and the defendants have sort of argued their appeal on this basis, is treat the guardian ad litem as if she were a counsel entitled to fees only for prevailing. And I think the guardian ad litem, obviously, is an officer of the court. It's not her job to win the case or achieve any kind of result. It's her job to protect the interest . . . But if you and Ms. Harrison needed to talk to the client, you had to go talk to the guardian ad litem. Yes. And if Ms. Harrison was doing something, she needed to be talking to the guardian ad litem each step of the way, especially in this bureaucratic morass, am I doing the right thing? Am I doing the best thing to get the results for your ward, my client? I mean, her client. So you weren't asking for attorney's fees on behalf of the guardian ad litem. No. You were asking for costs. Costs. Right. Correct. Under, as I said, Rule 54. Based on the number of years involved, it was a little less than 20 hours a year. Is that right? Correct. And I think there were only one or two years in which he had more than that. And we would not be appealing that order just on the amount. I mean, frankly, it's not a whole lot of money one way or the other, not enough to waste three judges' time. But it's the role of the guardian ad litem in our legal system and the fact that Judge Perry thought it was important to have a guardian ad litem for this disabled litigant, it's really ‑‑ I use stronger language, but it's a disservice. Did anybody ever object to the appointment of the guardian ad litem or ever ask that the appointment be evaded? Never. That your services be terminated? Never. Okay. I'd like to make one little point, if I may, on the issue of the state fees. Two little points, if I may, and I apologize for running over them. Administrative and court fees, is that what it would be? I'm sorry, what? Would that be administrative proceedings and judicial proceedings? Well, that's what we're asking for, yes. In the state, I mean. Yes. There were both. Correct. In the two courts, in the circuit court and the Supreme Court? It was the Court of Appeals and the Supreme Court. It went to the Court of Appeals first. Right. The Court of Appeals handles the appeals, and then the Supreme Court takes it. All right. It went to the intermediate Court of Appeals. Correct. And then the Supreme Court. I don't know how that worked then. Well, it goes through the administrative proceeding, then there's an administrative law court, then you go to the state court of appeals, and that's usually the end, except in this case, the state Supreme Court. There's four levels. Right. Two administrative levels and two court levels. Correct. And the two administrative levels were several times because the case kept being bounced back and forth for them to do more. So, as I say, if I might take just 30 seconds on the issue of the state-related fees, number one, there's one point that was raised in the defendant's brief that we didn't quite adequately answer in our brief, and that's they have a case called Olin v. Wakanamoku, something like a Hawaii prison case, in which they say procedural rules cannot give rise to substantive rights. And that doesn't apply here because what that Supreme Court was talking about there was the definition of a liberty interest under the due process clause. And I understand and I agree that ordinarily procedural rules cannot give rise to substantive rights for purposes of defining a liberty interest. Here we're talking about specific procedural and substantive rights created by the Medicaid Act itself and enforceable as this court has held under Section 1983. How do you maintain that the state proceedings were necessary to secure the final result obtained from this litigation? A couple of things. First of all, it may be that, well, because if the state proceedings had gone the way the defendants proposed, she would be out of the program entirely and never have been able to pursue or obtain the benefits of this court's ruling that she was entitled to res hab, residential habilitation, with reasonable promptness. But let me just say, we are not asking this court to decide that they were reasonably necessary, that that work was reasonably necessary and related. We're asking this court to tell the district court that that's the test so that the district court can make the determination under the right rule of law rather than the erroneous rule of law that the district court did follow. You're saying that if she had lost that case in the Supreme Court of South Carolina, we would never have had this 2011 appeal? That's right. They ruled in 2005 as an administrative matter that she was not entitled to any services. At that point, she asked for a hearing and got a hearing before the administrative law judge. She lost that hearing and went to the administrative law court. They went back and forth a couple of times. Then she appealed to the Court of Appeals and finally went to the state Supreme Court. And what year did she win in the state Supreme Court? 2011. 2011? 2011. That was 2011 is when you won here, too. It's all part of the extraordinary Koska-esque road that this client has had to travel through. Let me just say one last thing. This needs to be the last thing because we're going to go to Mr. Whittington. Okay. But I just want to ask, have I answered your question, Judge Wynn? Okay. The only other thing I would say is we have applied for fees under the state statute for the state work. And obviously she can't collect twice. And I'm not here to tell this court which court should go first or which court should go second. That case is in the Court of Appeals. The fees were turned down at the administrative level. It's in the Court of Appeals, been briefed but not argued. If the state Court of Appeals decides she's entitled to the fees there, obviously she wouldn't have the fees here. But the point is the standard is more difficult there. We have to show under the state statute that the state action was unreasonable or without reasonable justification. And so it's conceivable that we could lose there and still, under our theory here, under Delaware Valley, be entitled to fees in the federal court. So I just want to make it clear to the court that's the procedural situation. Thank you. Thank you very much. I'd like to hear from Mr. Whittington. And you have saved some time for rebuttal from his Harrison head. Thank you. Mr. Whittington, good to see you, sir. Good to have you here. Your Honor and the whole panel, bear with me just a minute, please. May it please the court, this case, the key to understanding this case, I think, is that it is and properly speaking always has been an action for the enforcement of a 2003 authorization by the Department of Disability and Special Needs. It's an action for enforcement of that, not an action to revise that. The place to have that determination of a CTH-1 or an SLP-2 revised, changed, or reversed is in the state system. And this Court has recognized that in both Doe-1 and Doe-2, that if you have a problem, if you prefer a CTH-1, I mean a 2 over a 1, you go to the state system and you get it or you try to get it there. And Mr. Durfner just said, well, they've tried and tried and tried and haven't been able to succeed in getting anybody to listen to them there. Well, there are remedies. If you can't get a hearing in a state court, that doesn't give you the right under the Medicaid Act to come in here and try to revise the state relief that was granted. You find a way in state court, and it was pretty easy, too. For instance, in 2007, as a result of sort of an ancillary part of the administrative law court case, the case was back before the hearing officer, DHHS hearing officer, for a determination of where her interim placement should continue to be. And he said, well, she still gets respite care in a CTH-2, but it's still respite and it still is not a CTH-1. It remains respite. If they had had a problem with that, and their briefs are full of information about why she was allegedly harmed by being in respite care, if that needed to be fixed, it could have been fixed by an appeal to the state administrative law court right then and there. And really, obviously, there are all kinds of other remedies. Did you try to re-litigate this case one and two? No, sir. You look like you are. We already ruled on those cases that she prevailed. I'm not trying to re-litigate those cases. North Carolina fought her efforts tooth and nail at every turn. And you were making suggestions she's only here because she ignored every opportunity that was available to her that somehow she found her way to the court. She was required to be here and a very significant rule of law in terms of Medicaid actions were amenable to these 1983 actions. That was a pretty seismic victory, wasn't it? Wasn't it, counsel? I am not aware of any new ground that was broken in this case. All right. Go ahead. And I'm not here to re-litigate those. Let's talk about the ground you outlawed and talk about eternity. Okay. Well, you look in terms of, I would submit that, you look in terms of Mercer, this court's Duke v. Duke case and the Ferrari v. Hobby case. If this had been a damaged case, I would submit that the relief she actually got. In that Mercer case, we gave her lawyers 300 and some thousand dollars. That was on the basis of significant. I was on that football kicker affair. I was on that thing. But that was on the significant public issue, I think. It was not. She got something. And the court. There isn't as much time as these folks spent, I don't think. The district court granted summary judgment and we reversed it. Well, Mr. Ferrari's attorney spent a lot of time getting prevailing party status, too, and he got a nominal damage. And they had a trial there, too, after we sent it back. But anyway. Well, you're talking about Mercer again. Whatever it was. Yes. They got a big fee. They did, but it was based on the. Duke wouldn't treat her right under Title IX. And you got here, you got a determination against you and a directing in that last opinion to go back for reasonable attorney fees under 1988. And Ferrari. That's the mandate. And you went back and said she's not entitled to any attorney fees. And you're even appealing here now still saying she's not entitled to attorney fees. Ferrari specifically says that a reasonable attorney fee can be no fee at all. It can be. And you're saying she's not entitled to any. We said she's entitled to a reasonable attorney fee. In your position, she's not entitled to anything. And I would submit when we got back to. . . Oh, she didn't win anything. She won two appeals here and one in the Supreme Court of South Carolina. Well, Ferrari got a verdict, too, but winning anything is not the issue. That's not success. I mean, part of it, one of these elements is success. Well, when you. . . Again, look at Mercer, and it says you compare the relief sought to the relief actually obtained. The relief sought, and we've documented it in excruciating detail, she sought every single time she was in this court or in the district court, she sought a CTH-2, or I'll call it a 24-hour await care placement. That's what she sought. She never got it. This court recognized. . . That's why I'm not re-litigating 0-1 and 0-2. This court said she can't get that in this case. She can't get a CTH-2 with anything. You can't revise the state decision in this court. That's not what this action was about. This action was about enforcing the 2003 authorization. It went back. One would think, okay, the Fourth Circuit has said work with her to establish a CTH-1 or an SLP-2, not a group home, not 24-hour care. And I have to point out that I was a little remiss in not citing to the record myself, as Mr. Davis has done, Mr. Durfner. It seems like earlier you responded to Judge Gregory that this case didn't involve any new areas of law. And it seems to me my reading of Doe 1, at the very least, there seems to be a private cause of action recognized in 1396 or so for a 1983 action, which heretofore, before that case, had not been the law. Well, A-8, about reasonable promptness, I didn't actually raise that in the brief. But I'm advancing it, at least in terms of what was accomplished in this case in Doe 1. That's a private cause of action that previously had not been recognized in a 1983. I'm counting on memory. I believe it had never been recognized in this circuit. I believe it had been recognized in several other circuits. It was one of the first times here, and it happened in this case. My only question, it seems to me that's a new area of law, whether it comes by whether you bring it up or I ever. It's new law that resulted from this litigation. It was new law for the Fourth Circuit. It had been so held in Doe v. Child. All that matters here is that we're talking about the new law for the Fourth Circuit. Because if you don't have it in the Fourth Circuit, it is not law. Well, if it was worth something, I would submit it's not worth much. If you want to take the view that, yes, it did establish a principle, it wasn't really dramatically novel for the whole country. There had been some cases in other circuits, and I said we didn't even argue that reasonable promptness, the private right of action aspect of reasonable promptness. But I did want to get back to the fact of working with her to do a CTH-1 or an SLP-2 on remand. There's a whole string of e-mails in Volume 3 of the record, mostly between Ms. Harris and myself. It starts on page 1048 and ends on page 1085. Basically what happened when we got back down from Doe 2 in 2011, she sent me an e-mail and said, well, we'd like to try a 24-hour care, quote, SLP-2. And we worked and we went back and forth, and finally she came up with a budget. You're talking about this is after our decision in 2011? Correct. SLP-2 with 24-hour care, which isn't an SLP-2 at all. We've documented that in some fine detail. But nevertheless, we didn't reject it out of hand. I said DDSN will look into it. Send us your budget. That took a while, but she did send the budget. It turned out that it was way out of line with what DDSN had in mind for an SLP-2 apartment, which is, if I remember correctly, $50 or $60 a day. This was six or eight times that much. It wasn't what the Fourth Circuit, it wasn't what this court ordered, an SLP-2. It wasn't what was authorized in 03. And on the other point, the CTH-1, I had advised her that. What was authorized by our decision? It seemed to be a disconnect with you in that. What was authorized? What was authorized by? Our decision. Your decision said go back and you didn't give her a CTH-1 or an SLP-2. No, he said devise appropriate remedial relief. Appropriate remedial relief and determine a reasonable attorney's fees pursuant to 1988. Well, I think you have to read that in light of the fact that the only remedy that she was advised, that this court held in 02 that all she was entitled to was a CTH-1 or an SLP-2. And they didn't want it, and that's why I was coming. Why didn't you give her that then, a permanent one, right then? Forget about the negotiation going on with your disagreement on CTH-2. Why didn't you do that? Why didn't we give her? A permanent CTH-1. Because CTH-1, a permanent anything is a permanent CTH-1. One, one, one. I asked her. I said, and this is volume three. I'm asking her why didn't you do it, state. I think I'm not. I told her back in 2012 that the agencies are willing to look into possible CTH-1 placements if there is interest in that on the part of your client. That's 1061. And she wrote back to me just a few days later and said, I'm afraid that a CTH-1 will not meet the plaintiff's needs. That's 1062. So we put it out there. We can't force people to take a remedy that they don't want. We just can't do it. And that's what this court said. You didn't give her CTH-1 or SLP-2, go back and work with her. Well, we worked with her. Nothing happened. Her idea of an SLP-2 was basically the same thing as a CTH-2. And you had asked about the temporariness, Judge Gregory. The respite was temporary in a sense, but there was another aspect of this that was also made it temporary. This was, in effect, a pendente late placement. After she was determined to be ineligible in 2005, at that point, and she appealed that, and it went for quite a long time, as you've heard. Is that the one that was reversed by the Supreme Court of South Carolina? In 2011. Yes, sir. Six years of litigation to get that. Got your clients reversed. Yes. But reversed and remanded for a hearing about whether she was really mentally retarded. I have to say that the hearing officer ruled against us on that in the end, but I would submit there was substantial evidence either way. Now, that really is a re-argument. I shouldn't even say that, but that's what happened. We didn't appeal that because there was substantial evidence in support of their position in the state case, just as there was in support of our position. Your point in support of the CTH, is that going to the question of whether you maintain that the plaintiffs were not largely successful in getting the relief they sought? Well, other than perhaps the theoretical point that you mentioned, or let's say it's not theoretical, prior right of action. Other than that, they obtained nothing.  They sought injunctive relief. I mean, I don't even see this whole CTH business in the prayer for relief. They were seeking injunctive relief to order DDSN to permit, to provide her with these residential rehabilitation services, and that's what they got. The prayer for relief, well, could I walk back there and just pick up the part with the prayer for relief? I don't think we need to get into that. Okay, well. We can actually put it on the ground and see what's there, but in terms of whether they were successful, they were seeking primarily injunctive relief, were they not? They were seeking injunctive relief to have residential rehabilitation, the other part of it I was going to quote, in a setting or a placement of her choice. Well, it turns out this court said your choice doesn't include CTH 2. This plaintiff won on some points, but they were of no value to her. Actually, the defendants won on some points, too. We won on the fact that you don't revise the estate placement in this court. You're saying ultimately plaintiff got nothing out of this litigation or got little out of this litigation that was fought so hard by the defendants all these years? I mean, you guys have been relentless on this. I mean, it's been going on and on. We have not. We have been relentless in saying just exactly what Doe 1 said, which is she's not entitled to a federal court order ordering a CTH 2 placement. We would have been derelict in our duty if we had not defended that because that's what this court said. You don't come here to get a revision of the placement decision. And the answer is what did she get through the injunction? Nothing. What practical relief, what difference did it make to sue Doe that this case was decided after all these years? Nothing because they didn't want what Doe 2 said she was entitled to, and it was propounded to them. It was discussed. The court did indicate that, at least it indicated, that our mandate from the Fourth Circuit was that the defendants are obligated to provide the services of placement established for this 2003 care plan. And that's something that was being litigated here. And the end result, apparently there had been something pretty good to come out of it from the plaintiff's perspective. They prevailed throughout this, and the type of relief they sought seems to be injunctive relief in which they prevailed. They sought injunctive relief, and they prevailed. They did prevail. That gets you to step one. That gets you the eligibility for a reasonable fee, but it doesn't get you to the entitlement. That's what Farrar, in other cases, said. She got nothing. She was in CTH 2 at the beginning of this case. At the end of this case, she was still in CTH 2, and it's not because we didn't offer the other two. We did. They were rejected, and there was nothing much we could do about it. We weren't going to make a take-it-or-leave-it offer to her. I just read you the record where they rejected the CTH 2, but they did it many other times. They prevailed throughout as well. Your Honor, I could go into the other points. I'm happy to rely on the brief on them or hear one reply as my time is up. Well, you haven't talked about that Nagari and Adelaide fee. I would submit that the Nagari and Adelaide. And Nagari, do you agree that you're entitled to cost under 1988, the prevailing party is? If you're a prevailing party, and again, if you. . . The reasonable attorney's fees and costs under 1988. And do you agree that Nagari and Adelaide fees or costs under 1988 if the court appoints Nagari and Adelaide? If the person is a prevailing party. I think it's subject to the same standard. I'm not here to quibble over $3,000. Well, you're relitigating those two then and saying it wasn't, they're not a prevailing party. No, I am saying. . . Two things. One is. . . That's what I'm trying to get to is whether the Nagari and Adelaide fees are costs. And if they are, do you agree that you're entitled to a Nagari and Adelaide fee as costs under 1988? I think. . . I'm not sure that the cost rises or falls with the degree of success just as the fee does. Well, the Nagari and Adelaide was never counsel of record. Correct. But she was appointed by Judge Perry by federal court order as a Nagari and Adelaide. Right. For this young lady in this proceeding. And the district judge said that many of her hours were basically expended as being sort of an additional counsel. And that was on the district. Who would these lawyers talk to on behalf of their client? They'd have to talk to the Nagari and Adelaide under the federal court order that you didn't challenge. Well, it was ex parte. Ex parte. Well, you can go in and move to vacate. You know how to do that. She was Nagari and Adelaide for, what, 12 years? Yeah. 14 years? 12 years? Something like that. I think the Nagari and Adelaide was in Richmond for both of the previous appeals. It should be like the client being here. She's the Nagari and Adelaide. You've probably served as Nagari and Adelaide a few times. I used to do that in my practice of law. The courts would appoint us. Well, Your Honor, as I say, I . . . And it was awarded $3,700. All right. And we're talking about it as fees. And again, but the Rule 54E talks about it as costs from being recovered. Costs. What would a Nagari and Adelaide be other than costs of litigation? Well, assuming they are costs, again, I think . . . I would submit, and I don't have great authority in my head to support this, but I would submit that if you weren't successful, if you didn't obtain what you actually sought to get and don't get fees for that reason and get reduced fees because your degree of success was minimal, did not exist, that that same percentage of reduction should apply to the GAL as to the attorneys. So if the degree of reduction is 90 percent, then the reduction of the cost should be 90 percent. You don't think that the . . . Right. . . . is obliged to pay the Guardian Adelaide? Only $0.10 on the dollar? Only on a prorated basis or whatever they're trying to get. Okay. I want one clarification on the fact that you say, I guess, agree with the district court's determination there's been no change in the status quo. Correct. It seems like it took a federal order to get the defendants to provide the placement alternatives to planning that was included in the residential rehabilitation services and DDSN. I'm having a hard time saying DDSN. They only did that after being ordered to do so, to comply with this obligation to tender those alternative placement options. They weren't doing that before this federal order came out. Is that not correct? That is correct, but . . . I mean, why is it they don't have something? They didn't have this when it started out. They never wanted it. Pardon my emotion, but they never . . . They asked for it. It's right at their relief. Didn't they ask for this? I mean, and that's something the court ordered. The federal order says do this, and DDSN only did it after the federal order, even if it ordered them to comply with their obligation. They didn't do this before this, and that has to be a good result out of this lawsuit because they didn't have that. It didn't. She didn't wind up in one of those placements. Matter of fact . . . Why should it matter if she doesn't . . . Why should it matter in the calculation of attorneys fees that the plaintiff didn't find the options acceptable? I mean, that's one thing, but to get something that you don't have a placement alternative, even if they say, well, that's not exactly what I want, but it is an advance from what they didn't have. It's not an advance at all. They never wanted it. They reiterated the minute we . . . Well, not the minute, but within the month after we came back down on appeal. They never asked for a CTH-1. They said from day one almost, in 2003, we went to court with Judge Perry for a preliminary injunction hearing because they were fighting DDSN's provision of a CTH-1 to her. They said, we don't want that, Judge Perry. We want a 2, and he said no. And so then . . . I just want to make sure. They didn't have it at the beginning. In this court, they do have that, whether they want it or not, and that's a good thing to have it, even if they didn't ask for it. I would say it was always on the table, but in view of the consistency . . . I don't know where the record shows it was on the table. I don't think DDSN made any effort to provide that before that federal court order. I haven't found that. Well, it would have been on the table if they'd showed any interest whatsoever, and that's the key to this. I don't know if we can go there. I mean, we're in a lawsuit. It may have been on the table, but if it's something you thought might have been helpful, you would have said, hey, this is on the table. I mean, now in hindsight, now that the court says give it to them, you say, well, this would have been on the table. Well, let me go. I know my time is way over. You're right. Okay. As long as we're asking questions, you just . . . All right. I think this is fundamental to your proposition. Let me . . . In 2003, I just go down a couple of things. On page 84 of the record, there is a statement by Plaintiffs' Counsel, we have considered and rejected a CTH-1 and an SLP-2. Right at the very start, the brief on the preliminary injunction, we have considered and rejected both an SLP-2 and a CTH-2. They had an affidavit in connection with that hearing from a psychiatrist who said, no, all that will work for her is 24-hour awake staff in a group home. That's not a CTH-1. It's not an SLP-2. One more. I'm on board to death with this one. That was pages 96 and 97. But 697, again, early in the game, Ms. Harrison said the plaintiff objects to a home with a family, which is a CTH-1. She wants to live with young women her own age. Now, with all of that out there, just in the first two or three months of this case, and the guardian ad litem said the same thing in an affidavit in 09, a CTH-1 is not good, she might be killed if she's in there, et cetera. Well, how can we be faulted, I ask rhetorically, for not putting it on the table, literally putting it on the table in light of that profound lack of interest on their part? It came back down. We've been ordered to work with her to try to work it out. We did, and you see the results. Nothing happened because they didn't want it. They didn't want anything but 24-hour wait care. The relief meant nothing to them. It wasn't us that made it useless, it was them that regarded it as useless. And they regarded it as useless to this day. And when we came upon, you came upon DOE II, you augured all those things to us, didn't you? No, Your Honor, I didn't. You should have. You should have. Well, anyway. Isn't that a record for South Carolina? Why didn't you argue it? Well, back on remand. That's why I said you are relitigated because at the end of the day in DOE II, we said that she was a prevailing party, correct? Correct. Okay. Now, you as a student agent, you went on for 90% of your arguments showing how she didn't get anything. That's what you were talking to Judge Wynn about. She didn't get anything. As a matter of fact, at the end of the day, she got nothing. But we said she was a prevailing party. So that's the law of the case, correct? That's the law of the case. Mercer v. DOE is also the law of the circuit that says if you're determined a prevailing party and entitled to a reasonable fee, the next step is to determine the entitlement, which could include no fee at all if you obtain no practical relief. Fair enough. Reasonable could mean zero, correct? Correct. But my question to you is this. Since the district court disagreed with your argument that zero was reasonable and did give attorneys fees, don't you lose if we disagree with you on that zero proposition because you can't really defend this award based on the analysis of the district court, can you? She says that this was a complex case, yet the comparatives of cases where these were simple cases, they were very run-of-the-mill type cases where lower-level associates could have had it. She found that this was complex. How do you make that a comparative? And then there's a chart that says categorically vague with no other explanation. Unless we agree with you that zero is reasonable, how could it stand? How could this award stand? Well, the district court did say on the last page of the order that the plaintiff's degree of success was limited. The status quo remains in effect. The status quo that was being discussed was she's still in the same place she always wanted. That's something close to our mandate rule because we said she was a prevailing party, right? Yes, and the district court didn't disagree with that. I thought you said she was a prevailing party. No, no. I think that the analysis we've used is completely congruent with Doe 2. There's no attempt to avoid or evade Doe 2. You said she's entitled to it. You actually won three cases, one in the Supreme Court of South Carolina and two here, correct? Right, and I'll address any other things on reply. If I may just rely on the brief for other points I didn't mention. You know, you bring up the Mercer case. Yes. From your perspective, I've been thinking about that case. Mercer, I know you say this cause of action that the Doe 1 recognized for 1983 is sort of making it like it's de minimis, but it's pretty significant, I think, to have a new cause of action established in a circuit that arises in 1983. And Mercer makes it clear that in those instances where you have a significant legal issue involved that serves a public purpose, and clearly whether that's what they wanted or not, that seems to be a rule that serves a public purpose and is a significant legal issue. I mean, these 1983 actions, you don't just come up and say something is automatically an action you can bring under 1983. I mean, it has to be established as we did case by case, and this was actually established in this case in Doe 1. I'm having some – you brought up the Mercer case, and that's why I say the Mercer case actually supports that proposition. So you get beyond all the other arguments and go there. Well, if we go there, I would just submit to you that maybe it's worth something but not worth the kind of dollars they're asking for, and maybe something in the same – But Mercer goes there. In the same – What he deals with there is a public purpose served. And is there a public purpose served when a case establishes that a cause of action that heretofore had not been established in a circuit is now the law of a circuit? That's pretty significant from my perspective. Well, I don't think it's one of those things that says, well, that's not butch. Actually, it is. It's from henceforth. That's a cause of action. You don't have to come in and worry about that anymore. Well, again, Justice O'Connor in Farrar, which is where this all comes from, uses terms like groundbreaking novel, et cetera, et cetera. This was just a case – I don't want to minimize it too much because obviously – That's a significant legal issue called a novel. Excuse me? The district judge here said it was a novel, I think. And we pointed out in the brief that there wasn't really much – No, but she said it was novel, even in cutting all the fees back. She said it was a novel. You now say it's not worth anything in the case. Well, actually – It falls a little. No, I did use a fallback position and say, well, if it's worth something, it's not worth the whole thing that they asked for. It's not worth what they asked for. See, it didn't get even close to what they asked for. You have to be saying that it's not worth as much as they got. Well – That's what you mean, isn't it? Yes. Because they asked for what? They got about 10 percent of what they asked for, or less than 10 percent. And that at most, that was all they were entitled to from this. But you say they weren't – they're not entitled to anything. I mean, your position is you cross-appealed and you say they're not entitled to anything. That's what your appeal is, right? That's the cross-appeal. That's your cross-appeal. We have to take that up. You have a cross-appeal, and your position is they're not entitled to anything. No fees, no cost. Zilch. That that's the reasonable result, notwithstanding what's going on before in the federal court system of South Carolina and in the state court system of South Carolina and in the administrative proceedings in South Carolina over 12 years. And if – And you've been involved in it all that time? Yes. Are you appointed as an assistant attorney general, or how do you all work that? No, there was originally a damage claim in it, and that's how it gets to the outside counsel, the insurance company. But it's not – But you're outside counsel for the state defendants. Right. Okay. Okay. I would like to make one more point if I may. Go right ahead. This is the longest I think I've ever – We've been very – I've ever been – We're giving you all a chance to argue your case. That's what you came up here for. Well, we – This is a lot better than being out there in the cold. Well, I got here – We're glad to get in here and listen to you fellas. I got here – You're all doing a good job. Well, that was one thing, anyway. The – again, if you say, okay, we don't like your cross-appeal, we think she's entitled to something. You want to abandon the cross-appeal? No. I think – Okay. You're sticking with it. So your position in the case is they get zilch. But – Right or wrong. That's our position in the cross-appeal. That's your position in the cross-appeal. I want to make sure we understand your position. But now you're going to tell us what your fallback position is. Well, the fallback position actually is in the brief. And that is that it – nevertheless, if the court disagrees – If it's in the brief, you don't want them to get anything. That's your appeal. Your cross-appeal. Your appeal. It's way back at the end of the brief, I must admit. And it's a long brief. But the – we did say, okay, here's how we was cut and so forth, the rates and the hours. And if you find that she wants something of value, we put down a low figure. But we didn't argue only nothing. The hourly rates are too high. Right. She shouldn't have been charged. Now, you don't disagree with the district judge finding this is not a desirable piece of litigation for a plaintiff's lawyer. She acknowledged that this was not very desirable. It's contingent fee. You may not get anything. If you work on this kind of stuff for 12 years, and then the defendants, even after they lose, will come in and say you're not entitled to anything. I mean, lawyers can – they've got to support children. If a private-paying client had – Lawyers for plaintiffs, I mean. If a private-paying client had been presented with a choice of trying to revise this 2003 authorization in the Fourth Circuit to go to state court and do it, I think a private-paying client would have said, being duly and properly informed, would have said take it to state court. It doesn't belong in federal court. So you think that was a bad lawyer to be here. That's all. They made bad decisions, counsel, and they shouldn't have come. They asked the federal court seven times to revise the 2003. They won two appeals. They never got it revised. They never got it revised. That's what they wanted. And that's just – And they got an order that – or a mandate from the court that says they're entitled to a reasonable attorney's fee pursuant to 1998. And that 1988, that's what we've got to figure out. And maybe it's nothing more than what the Judiciary Court did. Counsel, you really understate the significance of the door of the courthouse being open for Medicaid petitioners and appellants. You say that wasn't – that's significant. Medicaid many times is the least of these, the dispossessed. For the court to recognize that 1983 is available to them and you say that's little or nothing, that's surprising to me as counsel. Well, I know, but to say that that's not important. And they didn't say that they shouldn't have been in federal court at all yet. It was only here where they prevailed. And even in your own refined Supreme Court, they prevailed there as well. And yet you would come in and say in a cross appeal they're entitled to zero, and then your fallback is that, well, I think you said, well, we threw a low, low figure for them in case it suddenly was there. But it's not that kind of fiat and that kind of randomness we look at. For example, the paralegal rate, that same paralegal was approved for $140 an hour, but here it's $85. Not the same type of – a paralegal rate, correct? Was something bereft in this paralegal that she would be entitled to the rate of $140? Well, there was nothing to indicate that she – Well, what explains $85 then, the rate of $85? There was nothing to indicate that she had paralegal training, worked for a law firm or anything other than the sole practitioner. She was in the office with Ms. Harrison. Counsel represented that paralegal was supposed to bring a certificate? Are you questioning integrity of counsel when they say that's not paralegal? No, but a lot of that paralegal material – this – though one is claimed to have taken 350, 450 hours and another 100 or so hours for the paralegal, that's on-the-job training. That's not – could I – one more thing on the reasonable prominence on the – She won that appeal. They won the appeal, too. Would it be fair to us to ask you to put forth what you charge per hour on that appeal, what your paralegal charged and how much time you spent and consider it? And you lost. My stuff is in the record. I don't know what's in the record or not, but I don't think it would be. I think when I look at hers. But you lost and she won. I know that. There was a rematch. She lost. She won. We say she won. She lost the – It was the prevailing party twice. Correct. We're going around circles. I know we are, but – I do – You're still sticking with your position that she's not entitled to anything, and we'll take that up. And, again, there are alternatives that the court could reasonably – thank you. Thank you very much, sir. We appreciate it. Ms. Harrison. May it please the Court. I'm Patricia Harrison. Your Honor, I'd first like to let you know that it's not true that she won nothing. SUDO is now NACTH2 receiving residential habilitation, but it took us until 2014 for them to agree to provide residential habilitation to her. The Senate agreement gives her the right to receive residential habilitation in any CTH1 facility, any CRCF facility. And as of – as late as 2013, the record shows that we have an affidavit at JA 1573. The DDS and service coordinator said we can't put res-hab on her plan of care. Defendant Lacey told us not to put res-hab on her plan of care. We will not give her res-hab. I understand Mr. Woodard said if you had asked for this sort of thing, you probably would have gotten this from the beginning, that you didn't really ask for this relief. And that's exactly what we asked for in the beginning in Charleston, and they said no. And as this Court ruled in 2011, it was not my client's responsibility to establish that placement, that as of 2011, they had abdicated their duty and not provided res-hab. The record also shows that even after that, we are the ones who sought out. When this Court said SLP, we immediately went to work. We found two providers that were willing to serve her in an SLP2, and there's an affidavit saying we were instructed not to pursue that placement by Defendant Lacey. So at the end of the day, we have residential habilitation services and a placement that every physician says that she needs to be. These services are costing $83,000 a year. That's not minuscule. So I think that idea that we ended up with nothing. It was a great, tremendous cost to Sudow as well as to me and my practice. I call the Court's attention to the chart at 1734 that shows that during this time when she was receiving respite instead of res-hab, her IQ went from 69 to 54. And to Ray, the GAL's affidavit at 1504 saying that we never were provided an SLP or a CTH1 and talking about the effect that failing to provide respite for over a decade had on Sudow. But it's only because of what you people have done here at the Fourth Circuit that Sudow now is in the placement that she needs. As to your absolutely right, Judge Wynn, this was a novel case, and that's what they told the Supreme Court when they attempted to appeal this Court's order in 2007. You're talking about a petition for cert? Yes, sir. That it's a novel case. They said it was a novel case, and they argued in their briefs to you all that nobody had ever done that before, so that you should also deny it. So, you know, the reason it's taken so long, we are re-litigating over and over. And I call this Court's attention to a couple of pages, J.A. 1469, where these officials at the start said, well, why is she still in respite? And they said, well, they did that because they didn't think they were going to have to keep her this long, and it was a cheap way of putting her somewhere without providing habilitation services for her. I'd also like to call the Court's attention to what we asked for in the summary judgment hearing. In the summary judgment hearing before Judge Seymour, we didn't ask her to place Doe in a CTH-2. What we said was we're entitled to res-hab, and that we... Summary judgment hearing or the injunction hearing? The summary judgment hearing. Summary judgment. Yes, sir. They want summary judgment. You're arguing they weren't entitled to summary judgment. That's what you should have been arguing. Right. And we asked not for a CTH-2. What we asked the district judge for was res-hab and a hearing. We said just make them give us a hearing because we kept going back asking for a hearing. They wouldn't give us a hearing. When they terminated her services in 2005, they wouldn't give us a hearing. You were asking for an injunction. You asked the court to require them to give you a hearing. Right. Yes, sir. But we weren't asking for the district judge to place her there. We're asking for an injunction to make them give us a hearing. And as late as 2013, there is an order in the court where the hearing officer said, I'm not going to change my order in 2007 saying she should be placed in a CTH-2, and I don't have the authority to enforce the Fourth Circuit's order. So even as late as 2013, they were refusing to enforce to provide res-hab, and that's in an order by their hearing officer. Is that one of the defendants that's named in this case? Kathy Lacey is one of the defendants that is named in this case, yes, sir. They're the ones who said that? According to the affidavit signed by the DDSN service coordinator, Kathy Lacey told the service coordinator, do not put res-hab. What did you say there? Well, that was the person. That's what I'm just trying to get at. Who was saying down there that they weren't going to comply with the court order? I think it's admission against entrance, and it was the DDSN service coordinator who signed that affidavit, the one who prepared the plan said, I can't put it on the 2013 plan because they told me not to. And I think if you look at the end of the summary judgment hearing in 2009, you see why we're really here for so long. When Judge Seymour said, well, why don't you just place her in her home community? You've got her in a CPS. You're in like someone, too. We've been here a long time. What is it that you want us to do? You want us to resolve this whole thing and make what we think is a fair award of attorneys' fees and guardian item fees as costs and resolve this thing, or do you want us to remand it for some further proceedings? What do you want us to do? What are you asking for? What we want you to do, Your Honor, is we believe that the record contains sufficient documentation to approve our rates, to approve our hours, and to pay the federal fees. Do you want us to fix a fee and resolve the case here and not send it back? Do you want to forget the state court fee? Oh, no, sir. Forget the federal fee. Right. We agreed with counsel that we would argue about the amount of the state fee. Where? Back at the federal court if it was determined that we were entitled to it. So we believe that you can rule on the federal fees. I agree with Mr. Durfner that because we haven't gone through the barber factors on the state fees, we're entitled to them under Delaware. So you want to carve the state fee out of it. But now, so you want us to give you a fee, vacate the $100,000 and give you another number. What do you want? What's the number? It's a number that we've asked on the federal fees. It's about $900,000. The number that you asked for originally and for the guardian idol item. Yes, sir. Vacate the $3,700 and give you what you asked for. Is that what you say? That's your position. Yes, sir. And then we remand for a determination under barber of the state fees. We haven't gone through the barber factors. You want us to determine that the proceedings are inextricably intertwined. Exactly, sir. And we would at that point also argue or request fees, file a petition for the time that we've spent since 2013. This is a matter of great public interest, Your Honor. It's devastated my practice. Well, that's not to offer under barber. It breaks my heart. We admire you, but we can't take that into account. But it breaks my heart when I get calls and no one other than me is taking these cases in South Carolina. And by awarding a fee that is reasonable, that was the goal of Congress in passing 1988, to encourage attorneys to represent people who can't afford to be in the courts. Thank you. Thank you very much. And thank all the counsel for their arguments and their briefs. And you have a ‑‑ I'm sorry. You get to argue some more because of your cross appeal. I do, but I'll be happy to ‑‑ No, you say what did you go ahead. Not so much this time. The board knows I've said enough already. Because of that cross appeal, you get to argue again. Okay. Well, in terms of a road map for the court, I would again say that if, A, the court declines to accept our position that the only proper fee, only reasonable fee is no fee, then the inquiry is whether the district court acted within its discretion for what it did award. And I would ask that the court review that exercise of discretion and determine whether or not that was an appropriate exercise of discretion for the fee award that actually was awarded. And that would be my two‑part road map. As for the state claims themselves, this ‑‑ Would you like for us to reduce the fee that was awarded either to zero or something in between zero, what was awarded, and the same thing for the guardian ad litem? Somewhere between zero and what the district court awarded or they're in in that ballpark. I mean, review the district court's exercise of discretion if you reject the cross appeal, which I don't feel in good conscience we can abandon because as far as Sue Doe was concerned, this case never happened. This never happened. She was in a placement a month or two after this case was brought, and her placement was unchanged after this case was filed. The state case, which was the only case that should have been brought in the first place, really would have gone along if this case had never been brought. She would have been probably denied for lack of related disability. That would have been appealed. It would have won or lost, as the case may be, in the state courts. And if what happened, you know, eventually the situation was reviewed, and she found a placement solely as a result of the state court, a placement to suit her solely as a result of the state court case. This court has said in Doe 1 that the outcome of the state case has no effect at all on any issues that Doe raises before the court, and that in Doe 2 that the CTH1, the relief ordered in Doe 2, would be in effect only pending the outcome of the state appellate process. In other words, what all this fight has been about has been the pendente leite remedy. And when the state case decided the eligibility, which was the proper rule of the state courts in this matter, that ended the right to enforce anything unless they wanted to challenge that, and they didn't, the later placement. So that's my – the district court on the state issue did say the state proceedings were not necessary to advance the inquiry in this court because this court was just merely enforcing a penalty. Would that be a factual determination or a legal determination? I would think it would be a factual – excuse me, a legal determination. The web case on which they rely say the state proceedings have to be both useful and of a type ordinarily necessary to advance the civil rights case, and this was just a remedy out there. The federal right, so to speak, was an enforcement of power. You don't get a right to establish a substantive right just so that you can use enforcement. With that, Your Honor, unless there are any other questions. I just have one question. Yes, sir. And that is getting back to the cost in the 1988 for the guardian ad litem. The guardian ad litem here just happened to be someone who's trained in the law, but that was not her role here. The court, Judge Perry's order was to have a guardian ad litem, which was not objected to. That's a civil law. This litigation, you now categorize it for not. I think you said it. You said that as far as Doe is concerned, this is just nothing happened. It's indisputable. It's kind of interesting where you put that. It's interesting. I could talk for a long time about that, but that's not the case for it. There's not a place for it. In terms of that, how do you square that with the mandate that the guardian ad litem to act? The litigation is still going on. If she becomes officially the ears and the mouth of Doe, can she say, All right, lawyers, I'm tired of doing this. Stop litigating. As long as the litigation is going, doesn't she have to continue to serve? Then to say at the end, you get $3,700, not the 50. How can she cut that off? She has no control. She has to continue to. Then you criticize her. I think she came up here today. That may be a good way to stay informed so you can understand what lawyers talk about in court. What I'm saying, who should pay it, the state of South Carolina? Should it come out of the United States Treasury? How can you punish her? Well, maybe I think maybe a light bulb just came on in my head, Your Honor. I've been a little dense about this maybe today. But if what's been said about the guardian ad litem is that she would get fees because of her service as a guardian ad litem, whether or not the attorneys were entitled to fees or not, if the law supports that, then I'm not going to oppose it. No, the 1988 entitles the attorney to a reasonable fee and cost. And you'd argue that maybe reasonable means reasonable cost, too, that the guardian ad litem has to be reasonable. But you say somewhere in your argument, I think, that the guardian ad litem wasn't needed. It wasn't a needed guardian ad litem, but nobody ever challenged it. And this lady was appointed by Matthew Perry, Judge Matthew Perry, in 2003, and she served years and years and years and years and never worked and didn't get anything. Well, if the law says and I'm not— Why did somebody go in like you or somebody for the state and say they don't need a guardian ad litem, Your Honor? Let's vacate this order. Well, I must say— I'm kind of waiting until she submits a bill for her work and then say, well, she wouldn't need it. It's a waste of her time. I hate to stand up here and confess ignorance about this part of the law, but if there's a separate basis on which guardian ad litem costs can be awarded— No, costs. Fees. The statute is costs. Rule 54 talks about what costs are. Rule 54E, I think. But anyway, and I was trying to get your position on whether you dispute the proposition that a guardian ad litem would fall within that. She's not a counsel. You admit she's not a counsel of record. She's not in there as a lawyer. She's the guardian ad litem. She acts—she's like the trustee for Ms. Dove. It sounds as if the idea is that the guardian ad litem should be paid even if the lawyer obtained no practical— We don't have to decide that. We have to decide whether she ought to be paid here and what the fee should be. Okay. Well, I would say that— You don't challenge the standing of anybody to claim it, do you? No, no. All right. You could have done that by now if you had. But I think when a person loses 1988 attorney's fees or gets 1988 attorney's fees cut, I think the costs are often cut pro rata. They might be. And if this is part of the cost— This one was cut from $58,000 to $56,000 to $3,700. They were cut. Okay. Well, thank you all for your consideration of the case. We'd like you for your service. And thank you for all the time you've allotted me here. Like I said, this is the longest oral argument I've ever been in. Now, Mr. Durfner wants to say something, but you don't have any rebuttal time. May I? One moment, Mr. Dove. It's not a rebuttal. It's not a rebuttal, Ed. It's not a rebuttal. It's just a clarification. Well, you made your argument. We gave you lots of time. I appreciate it. It's just a clarification of something we said. All right. You asked Ms. Harrison, what do we want to do about the state fees, and we've discussed it. We believe that the time was inextricably intertwined with the federal case, and we ask you to say that that's the rule of law, but the determination of whether it is or is not inextricably intertwined in this case is a factual matter, and therefore that's really not we don't know that that's for you. It's more likely to be for the district court to decide that. That's your clarification? Yeah. All right. Thank you. Thank you. And, Mr. Woodington, do you have anything you want to say about that clarification? All right, sir. Thank you. We appreciate all your work.
judges: Robert B. King, Roger L. Gregory, James A. Wynn, Jr.